ROBINSON BROG LEINWAND
 GREENE GENOVESE & GLUCK P.C.
**Attorneys for the Debtor**
875 Third Avenue, 9th Floor
New York, New York 10022
Telephone No.: (212) 603-6300
**A. Mitchell Greene**
**Robert M. Sasloff**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

In re:


**2626 BWAY, LLC,**

                            Debtor.
--------------------------------------------------------X

<u>**Return Date and Time:**</u>
October 5, 2010 at 10:00 A.M.


Chapter 11
Case No. 10-14731 (SCC)

**<u>DEBTOR'S OPPOSITION TO MOTION OF BROADWAY METRO ASSOCIATES
L.P. SEEKING AN ORDER (A) GRANTING RELIEF FROM THE
AUTOMATIC STAY PURSUANT TO 11 U.S.C. §362(d)(1) AND (d)(2);
OR ALTERNATIVELY, (B) DISMISSING THIS CHAPTER 11 CASE
PURSUANT TO 11 U.S.C. §1112(b); AND (C) FOR RELATED RELIEF</u>**

TO THE HONORABLE SHELLY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

      **2626 BWAY, LLC,** the debtor and debtor in possession herein (the "Debtor"), by its

attorneys, **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**, as and for its

opposition to the Motion of **Broadway Metro Associates L.P.** (the "Landlord"), seeking an

Order of this Court granting: (A) Relief from the Automatic Stay pursuant to 11 U.S.C.

§362(d)(1) and (d)(2); or Alternatively, (B) Dismissing this Chapter 11 Case Pursuant to 11

U.S.C. §1112(b); and (C) for Related Relief (the "Motion"), respectfully represents as

follows:

## **Preliminary Statement**

1.     As a preliminary matter, the Motion should be denied on procedural grounds in that it was not served and filed in accordance with the Federal Rules of Bankruptcy Procedure which requires that motions for relief from the automatic stay be served in accordance with Bankruptcy Rule 4001(a)(1), on the creditors included on the list filed pursuant to Bankruptcy Rule 1007(d), which it was not, and as with regard to the alternative relief for dismissal of Chapter 11 cases be on at least twenty-one (21) days' notice, which it was not as well.  Rule 2002(a)(4). *See*, the Affidavit of Service on file with the Court, at ECF Docket #12.  Since the Motion was not properly served, the relief sought by the Landlord should be denied with respect thereto.  However, since the grounds alleged by the Landlord in the Motion were based, amongst others, upon the Debtor's bad faith in the filing of this case, the Debtor will address the arguments in this opposition

2.     The Motion should be denied in its entirety since this case was commenced by the Debtor, not in bad faith, but rather to exercise its rights under the Bankruptcy Code in order to preserve its most significant asset - its valuable leasehold for the premises located at **2626 Broadway, New York, New York** (the "Premises"), and reorganize in accordance with the protections afforded it pursuant to the Bankruptcy Code.  Additionally, the Debtor seeking relief under Chapter 11 of the Bankruptcy Code was a necessary step to preserving its claims against the Landlord.  Without this Court's exercise of jurisdiction over the Debtor, the Debtor's financial ability and its ability to continue in the operation of its business will suffer irreparably, if not fatally.

3.     The Landlord asserts in the Motion that the bankruptcy filings were made in "Bad Faith" and as a litigation tactic.  The Debtor's filing was made to preserve its most

valuable asset, the lease to the Premises (the "Lease"). However, it is the Debtor's contention that the Landlord's conduct and actions have been clearly designed for it to regain possession of the Premises for its own benefit and to the detriment of the Debtor, its estate and the other creditors.

4.     All of the Landlord's arguments in support of its Motion for relief from the automatic stay, or dismissal of this case, stem from its unfounded premise that the Debtor filed this case in "bad faith" and its failure to understand that the Debtor still has rights in the Lease. However, the Debtor filed this case with the utmost good faith and with the intention to rehabilitate itself under the protection of the Bankruptcy Code. As described herein, the Landlord's actions throughout were for one purpose and one purpose only: to obtain the windfall for the balance of the Lease term for its own benefit. Moreover, Landlord wishes to keep the approximately $525,000 paid by the Debtor when it exercised the option to purchase of the Premises. It is clear, and as will be shown herein, that all of the Landlord's arguments are without any basis, and that when the appeals or a request to re-argue the decisions from the State Court, including, but not limited to, the denial of a yellowstone injunction and the determination of the holdover case are finally decided and the Debtor's claims against the Landlord are finally resolved, the Debtor will be able to continue to reap the benefit of its valid leasehold rights, and satisfy all of its obligations in full within a reasonable period of time.

5.     The Debtor sought the protections pursuant to the Bankruptcy Code in order to invoke the protections as contained in the Bankruptcy Code, and specifically, to invoke the protections as set forth in §362(a) of the Bankruptcy Code to prevent the Landlord from obtaining possession of the Premises.

6. The Landlord contends that the Debtor has no assets since the Lease was terminated prior to the filing of this case. As will be set forth in more detail herein, this argument is without merit, since there has been no warrant of eviction issued, the judgment of the State Courts have been stayed by §362(a) of the Bankruptcy Code, and appeals from the adverse decisions had been timely filed, thus preserving Debtor's rights; so that, there has been no final determination with respect to the rights of the parties.

## Jurisdiction and Venue

7. Jurisdiction under the Motion is vested in the United States District Court for this District pursuant to §1334 of Title 28 of the United States Code (the "Judicial Code").

8. The Motion has been referred to this Court for consideration pursuant to §157 of the Judicial Code, and the standing order of referral of cases to Bankruptcy Judges (S.D.N.Y. July 10, 1984)(Wade, acting C.J.). Venue of this Motion in this District is proper pursuant to§1409 of the Judicial Code.

9. This is a core proceeding arising under Title 11 of the United States Code. *See*, 28 U.S.C. §156(b)(1).

## Background

10. On September 3, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Code (the "Bankruptcy Code"). The Debtor has continued in the operation of its business and the possession of its property pursuant to §§1107(a) and 1108 of the Bankruptcy Code.

11. Debtor is the commercial tenant of the Premises.

12. Landlord is the owner of the Premises and the Landlord pursuant to a written lease (the "Lease"), dated September 6, 2006, between Debtor and Landlord for the Premises. (A copy of the Lease was annexed to Landlord's Motion as Exhibit "1".)

13.     The term of the Lease is for approximately another forty-four (44) years at a fixed annual rent.

14.     In July 2008, Debtor began to finalize negotiations with Urban Outfitters ("Urban"), a "Class A" commercial tenant under which Urban would sublease the Premises at a rent almost double what Debtor was paying. Debtor, which was unaware of a violation of the Zoning Lot Development Agreement (ZLDA) with the adjacent building at that time, exercised the option to purchase the Premises as well.

15.     When Landlord became apprised of the Urban deal, it tried to repudiate the Lease and option and tried to regain the Premises through alleged hyper-technical defaults of the Lease and tortuous interference with Debtor's business relationship with Urban. Debtor has commenced an action due to Landlord's acts in the New York State Supreme Court (the "Urban Action"). Debtor is contemplating removing that action to this Court, a copy of which is annexed hereto as Exhibit A.

16.     The first salvo in Landlord's war came on or about August 6, 2008, when Landlord purportedly served a notice to cure (the "Notice to Cure"), alleging Debtor had violated Article "13" of the Lease regarding insurance. When Landlord refused to withdraw the Notice to Cure, Debtor commenced an action (Index No. 602937/08) seeking a *Yellowstone* injunction and a declaration that Debtor had indeed secured the proper insurance under the Lease. Landlord interposed a counterclaim for attorney's fees in its answer to the complaint. Landlord also claimed the motion for a *Yellowstone* injunction was premature.

17.     As a result of Landlord's representations that the Notice to Cure did not threaten to terminate the Lease, Debtor sought to voluntarily withdraw its motion for a *Yellowstone*

injunction and Landlord opposed. Thereafter, the Court (Bransten, J.S.C.) issued an Order confirming the voluntary withdrawal of Debtor's motion for a *Yellowstone* injunction.

18. After the withdrawal of the motion for a *Yellowstone* injunction, Landlord sent Debtor a Notice of Default. Prior to the expiration of the Notice of Default, Debtor commenced a second action (the "Second Action"), and again sought a *Yellowstone* injunction. This second application for a *Yellowstone* injunction was denied by the court. Landlord subsequently moved to dismiss the Second Action and by Order dated May 12, 2009, Landlord's motion was granted, and the Second Action was dismissed.

19. After Debtor's application for a *Yellowstone* injunction in the Second Action was denied, Landlord allegedly served a Notice of Termination upon Debtor and, after the expiration of the Notice of Termination, commenced a holdover proceeding in the Civil Court (the "Holdover Proceeding") based upon the Notice to Cure, Notice of Default and Notice of Termination. After purported service of the petition, Debtor made a pre-answer motion to dismiss alleging a lack of personal jurisdiction. By Decision/Order dated May 26, 2009, the Hon. Arthur Engoron J.C.C. (the "Civil Court Order") dismissed the Holdover Proceeding based upon a lack of personal jurisdiction.

20. Notwithstanding the dismissal of the Holdover Proceeding, Landlord utilized the same infirm notices as the basis of an action against Debtor for ejectment and various other relief.

21. However, Debtor contended that as a result of the Civil Court Order, the Notice to Cure, Notice of Default and Notice of Termination (collectively the "Predicate Notices") were, as a matter of law, rendered null and void and can no longer be used as a basis to hold Plaintiff in default under the Lease.

22. On or about March 18, 2010, Landlord sent three (3) new Notices of Default each alleging a separate default under the Lease. The new Notices of Default were sent after the expiration of three (3) new Notices to Cure.

23. The Notice of Default which refers to a purported failure to have insurance (the "Insurance Notice of Default") alleges, *inter alia*, that Debtor failed to comply with the insurance requirements of Article "13" of the Lease by failing to provide Landlord with the proper and necessary insurance policies and insurance coverage.

24. The second Notice of Default (the "ECB Notice of Default") alleges a failure to cure two violations issued by the Environmental Control Board ("ECB") regarding a rusted underside of a canopy and a missing tin ceiling of the marquis.

25. The third Notice of Default ("Access Notice of Default") alleges a failure to give access to the Landlord. (The Insurance Notice of Default, ECB Notice of Default and Access Notice of Default are collectively referred to herein as the "Notices of Default").

26. The Insurance Notice of Default was cured on or before April 16, 2010, several weeks prior to the expiration of the Insurance Notice of Default. A letter of that date sent to the Landlord's counsel contained an enclosure showing that Debtor had obtained and paid for insurance and requested the withdrawal of the Notices of Default. The insurance was in compliance with the terms of the Lease. On or about April 20, 2010, Landlord's counsel sent a letter alleging that she had forwarded the insurance documents to the Landlord and was awaiting a response.

27. The Insurance Notice of Default should have been deemed cured because (a) the procured insurance binder, dated April 5, 2010 was proper; (b) the Landlord had procured and charged Debtor for insurance it obtained; (c) any alleged "defects" in the Debtor's policy had

been cured buy a revised binder; and (d) the insurance binder Debtor had obtained was a valid insurance contract. Moreover, Debtor contended that the reason that Debtor did not have insurance is because Landlord had objected to the policy it had with Lloyds of London. The Lloyds of London insurance policy only became necessary when Landlord raised objections to the policy that was in place for over eighteen (18) months and only became "defective" after Debtor exercised an option to purchase the Premises in anticipation of procuring Urban as a subtenant for almost twice the yearly rent.

28.     At the time the Insurance Notice to Cure was issued, the Debtor had already procured insurance on Landlord's behalf. Moreover, the Landlord drew down on the security deposit to reimburse itself for the procurement of insurance it had obtained for the Premises. That fact was never brought to the State Court's attention.

29.     Accordingly, the Debtor submitted that the Insurance Notice of Default was cured on or before April 16, 2010, a date prior to the expiration of the Insurance Notice of Default.

30.     Prior to service of the ECB Notice of Default, Plaintiff had fixed the conditions leading to the ECB violations. Accordingly, the ECB Notice of Default was a nullity. Moreover, it must be noted that none of the ECB violations were issued against Debtor. Notwithstanding the above, Debtor had the conditions addressed and repaired.

31.     The ECB Notice of Default required that Debtor: a) "promptly and diligently" cure and remove the ECB violations; b) pay any fines or fees imposed; c) file certificate(s) of correction; and/or d) provide Landlord with proof that Debtor had done so.

32.     All work to correct the rust on the canopy and the tin ceiling was completed in February, 2010. Thereafter, on February 22, 2010 and March 2, 2010, respectively, Debtor filed certificates of correction with the ECB for both violations contained in the ECB

Notice of Default. The certificates of correction both contain the following language, **"Your Certificate of Correction for the above Notice of Violation (NOV) has be received and approved by this department"**.

33.     Landlord's counsel was informed of the cure of the ECB violations by the April 16, 2010 Letter. The letter also contained a picture of the canopy and marquis showing that the alleged violations had been cured. There are currently no fines associated with the former violations.

34.     It is clear that all of the issues to cure the alleged ECB violations set forth in the ECB Notice of Default have been met. The conditions have been cured, the ECB violations have been deemed resolved, there are no fines and Debtor had provided Landlord with written proof of compliance.

35.     As to the Access Notice of Default, Debtor gave access to the Landlord on April 27, 2010 - so that alleged default was also cured.  Moreover, as of late, although no warrant of eviction has issued, Landlord has prohibited Debtor from having any access to the Premises, utilizing self-help to gain control of the Premises.

<u>**ARGUMENT**</u>

36.     This Motion should be denied because this case was filed in the utmost good faith, because Debtor has property rights that need to be protected, and Debtor has preserved those rights; and because Debtor has equity in the Lease to the Premises and the Premises are necessary to an effective reorganization or any reorganization in this case.

37.     Landlord argues that the automatic stay should be modified because the Debtor lacks any property interest in the Lease which are subject to the automatic stay or which are assumable, or alternatively, because the Debtor lacks equity in the Premises, and the

Premises are not necessary for an effective reorganization.  Further, the Landlord requests relief from the automatic stay because Debtor's case was filed in bad faith, or alternatively, that this case should be dismissed pursuant to §1112(b) of the Bankruptcy Code because it was filed in bad faith.

38.     Landlord has failed to meet its burden of presenting a <u>prima facie</u> case that the automatic stay should be modified for either "cause" and any reason since the Motion does not take into account that the Debtor still had an interest in the Lease when this case was filed, as will be explained more fully below.  As Landlord has filed to set forth a *prima facie* case, the automatic stay should not be modified.

39.     The ultimate burden of proving that the automatic stay should not be modified for "cause" lies with the Debtor.  <u>See</u>, 11 U.S.C. §362(d)(1),(g).  However, before the Debtor is required to submit evidence with respect to cause, Landlord has the burden of presenting a <u>prima facie</u> case or legally sufficient basis for relief from the automatic stay.  <u>See</u>, <u>Sonnax Industries, Inc. v The Component Products Corp.</u>, 907 F.2d 1280, 1285 (2d Cir. 1990); <u>In re Texaco, Inc.</u>, 81 B.R. 820, 829 (Bankr. S.D.N.Y. 1988); <u>In re Compass Van & Storage Corp.</u>, 61 B.R. 230, 234 (Bankr. E.D.N.Y. 1986); <u>In re Rye</u>, 54 B.R. 180, 181-82 (Bankr. D. S.C. 1985).  As the Court noted in <u>Sonnax</u>:

> The burden of proof on a motion to lift the stay is a shifting one.  Section 362(d)(1) requires an initial showing of cause by the movant, while Section 362(g) places the burden of proof on the debtor for all issues other than "the debtor's equity in property."  If the movant fails to make an initial showing of cause, however, the court should deny relief without requiring any showing from the debtor that it is entitled to continue protection.

Sonnax, 907 F.2d at 1285.

"Conclusory statements that a continuance of the stay will cause irreparable harm or that injury will occur if relief is denied are insufficient to establish cause." Landlord's contentions that the Debtor has no interest in the Lease, fails to recognize the substantial bankruptcy case law specifically on this point, and fails to take into consideration that Debtor would suffer irreparable harm if the Motion is granted. The Landlord contends that the State Court decisions wherein the Debtor was denied a yellowstone injunction, and the Decision rendered in the holdover proceeding commenced by the Landlord with respect thereto, means that the Debtor's interest in the Lease was terminated prior to the initiation of this Chapter 11 case. A copy of the appeals of the decisions in the yellowstone case and the holdover proceeding is annexed hereto as Exhibit B. The Debtor submits that these contentions are wrong.

40.     Debtor is in agreement that the extent of Debtor' leasehold interests is a matter of state law, Butner v. United States, 440 U.S. 48, 54, 95 S. Court. 914, 917, 59 L. Ed. 136 (1979); Morton v. National Bank of New York City (In re Morton), 866 F.2d 561, 563 (2nd Cir. 1989). Thus, the bankruptcy courts are to look to state law to determine whether a lease has been terminated before the commencement of the Debtor' case under the Bankruptcy Code and the extent of the Debtor' remaining interest under this Lease. In re Joker Enterprises, 35 C.B.C.2nd (MB) 195 (Bankr. S.D.N.Y. 1995); In re Sanshoe Worldwide Corp., 139 B.R. 585 (S.D.N.Y. 1992).

41.     The service on a tenant of a notice to pay the rent due or to quit the premises does not cancel a lease or sever the relationship of landlord and tenant. Likewise, neither the

issuance of a notice of petition nor the entry of judgment cancels a lease.  Under New York

Law, it is the issuance of a warrant for the removal of a tenant which terminates the landlord-

tenant relationship. See, N.Y. Real Prop.L §749(3) (McKinney 1994); Bell v. Alden Owners,

Inc., 199 B.R. 451, 458 (S.D.N.Y. 1996); In re Hudson Transfer Group, Inc. 245 B.R. 456,

458 (Bankr. S.D.N.Y. 2000); In re Joker Enterprises, Inc., supra; In re P.J. Clark's Restaurant

Corp., 265 B.R. 392 (Bankr. S.D.N.Y. 2001).

42.     In In re P.J. Clark, Judge Gropper recognized though, that "where the debtor is

still in possession, and can reinstate its rights under the Lease under applicable law, the

Lease is unexpired for purposes of §365".  Citing In re Stolz, 197 F.3d 625, 630-31 (2nd Cir.

1999); Robinson v.. Chicago Housing Authority, 54 F.3d 316 (7th Cir. 1995).  Additionally,

Judge Gropper in P.J. Clarke noted that the automatic stay remains in effect during the

appeal period as recognized by the Second Circuit, even where the debtor's legal rights have

been terminated, so long as it retains an equitable interest.

43.     In the instant case, no Warrant of Eviction was ever issued, and the landlord-

tenant relationship was never finally terminated.  Section 541 of the Bankruptcy Code vests

the estate with the debtor's legal and equitable interests in property as of the commencement

of the case.  Accordingly, the Debtor retains its interests in the Lease as property of the

estate.  If the stay was modified to allow the Landlord to complete its eviction proceeding,

without the Debtor being able to prosecute its rights, the Landlord would receive a windfall.

Moreover, as set forth in the Debtor's recitation of the facts, the Debtor had requested the

Landlord consent to a sublease with Urban that would have provided the Debtor with a

substantial income over the next twenty (20) years, well in excess of $20,000,000.  It is the

Debtor's contention that the denial by the Landlord of the sublease was unreasonable.

Debtor commenced the Urban Action pre-petition, in the New York State Supreme Court with respect thereto. Should the Landlord be allowed to modify the automatic stay to complete its eviction proceeding, the Debtor's rights with respect to the Urban Action could be adversely affected.

44.     The Landlord also contends that the stay should be modified pursuant to 11 U.S.C. §362(d)(2) on the basis that the Debtor lacks equity in the Property, and the Property (or the Premises) is not necessary for an effective reorganization. Debtor disagrees with these contentions. The Debtor believes that either through the operation of a business at the Premises (a business it still needs to construct), or the sublease (or assignment) to a third-party of the Lease, the Debtor will be able to earn substantially more monies than due under the Lease and/or the creditors of this estate. The facts of this case will demonstrate that had the sublease for Urban been approved, the Debtor would have made at least $500,000 more in income than the amount of its Lease obligations to the Landlord over a 20-year period, which belies the Landlord's contentions that the Debtor does not have equity in the Property, except for the fact that the Landlord believes that it terminated the Debtor's interest in the Lease prior to the filing of the case. Landlord's entire case hinges on its belief that the Debtor has no interest in the Lease. The Debtor contends that it still has an interest in the Lease, and therefore, believes it has substantial equity in the Lease, because its State Court remedies have not been exhausted, and the appeals with respect thereto are still pending. As a matter of fact, the Debtor should be granted relief from the automatic stay to pursue its appeals.

45.     The Debtor also disputes the Landlord's contention that the Lease is not necessary for an effective reorganization . It is the Debtor's contention that without the

Lease, there can be no effective reorganization in this case at all, because it's possible that the Urban Action will be adversely affected as well.

46.     One cannot help but conclude that the Landlord, being keenly aware of the value of the Lease, engineered the termination of the Lease so that it could re-let the Premises on its own terms and retain for itself the value in the Lease.  One can further assume that the Landlord's purpose in refusing to consent to the sublease to Urban was merely to delay the Debtor's efforts in order to evict the Debtor, or until the Debtor's business failed.  Accordingly, the Debtor respectfully submits that the estate should not be deprived of the value of the Lease, and that the Debtor's equity in said Lease should be preserved during the appellate process.

47.     Because the Debtor is in litigation over alleged defaults declared by the Landlord, the Landlord should not be allowed to benefit and unduly prejudice the Debtor's or the estate's rights.

48.     The Landlord then seeks to have this Court modify the automatic stay based upon the Debtor's so-called "bad faith", and/or alternatively, to dismiss the Chapter 11 case based upon the same grounds.

49.     The bad faith argument is the opening salvo by virtually every delayed party in virtually every bankruptcy case involving real property.  Yet, the substantial number of cases that are successfully reorganized in this and other courts stand as moot testimony to the "bankruptcy" of this argument.  Few, if any, cases would result in confirmed plans if mere speculation, without proof of actual intent to misuse the bankruptcy process, constituted grounds for dismissal.

50.     The Landlord attempts to establish the Debtor' purported "bad faith" by the recitation of a laundry list of facts.  The litany recited by the Landlord is one that is all too familiar to this and other courts.  However, the inference of "bad faith" is not necessarily established through the recitation of facts from a laundry list.  As the facts must be analyzed and taken in context with the totality of the circumstances of the case.

51.     "[Bad faith] is summarized as conduct which is inconsistent with the underlying purposes and contemplation of the reorganization and rehabilitation process and constitutes a perversion of legislative intent."  *In re Victory Construction Co., Inc.*, 9 B.R. 549 (Bankr. C.D.Ca. 1981), quoted in *5 L. King, Collier on Bankruptcy ¶1112.03 [3] at P. 1112-32 (15th ed. 1993)."  "There would appear to be a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose", *5 L.King, Collier on Bankruptcy ¶1112.03 [3] at p. 1112-35 (15th ed. 1993).*

52.     The Debtor commenced this case in order to preserve its interests in the Lease in the hopes of reorganizing around the Lease.  The Lease is clearly its most valuable asset; so valuable that the Landlord is taking extraordinary measures to regain possession of the Premises so that it can convert the building and reap the benefits for itself.

53.     With respect to the Debtor's liabilities, although Landlord indicates that the Debtor manufactured creditors in a fraudulent manner, this is far from the truth.  The Debtor listed creditors that either lent money or resources to the Debtor to assist it in the construction of the Premises (which the Debtor planned), the demolition of the Premises from its prior use and to lay-out the monies that Debtor needed to pay to the Landlord for the security deposit.  The creditors also represent pre-petition providers of services (the attorneys

that represented the Debtor), and other parties that have sent letters to the Debtor asserting claims against it.

54.    Landlord also asserts that the Debtor's bad faith filings mandate relief from the stay or the dismissal of this case because the filing of this case was merely a litigation tactic to frustrate the Landlord's enforcement of its rights, and that the Debtor abused the judicial process by improperly invoking this Court's jurisdiction even though it has no reasonable likelihood of reorganization since it has no "assets".

55.    The Bankruptcy Code empowers the Court upon a finding of cause to modify the stay or to convert or dismiss a chapter 11 case.  While there are several enumerated grounds listed in the statute, a finding of cause is not limited to the enumerated grounds and the courts are empowered to fashion cause from the operative facts of each case.

56.    C-TC 9th Avenue Partnership, 113 F. 3d 1304 (2d Cir. 1997) is the seminal Second Circuit case on the issue of whether bad faith constitutes cause warranting the dismissal of a bankruptcy case, and can be analogized for stay relief as well.  In C-TC, a partnership which was in dissolution, filed a petition thereby staying an almost completed foreclosure action.  The Court held that the debtor, which was not authorized to file a petition under the Bankruptcy Code, nevertheless did so to frustrate the legitimate efforts of its secured creditor who was foreclosing on the debtor's sole asset.

57.    In C-TC , the Court established several criteria as indicia of the debtor's bad faith:  whether the debtor had only one asset; whether the debtor had few unsecured creditors whose claims are small in relation to those of the secured creditors;  whether the debtor's one asset was the subject of a foreclosure action as a result of arrearages or default on the debt; whether the debtor's financial condition was in essence a two party dispute between the

debtor and secured creditor and could be resolved in the state court foreclosure action; whether the timing of the debtor's filing evidenced an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; whether the debtor has little or no cash flow; whether the debtor cannot meet current expenses including the payment of personal property and real estate taxes; and whether the debtor has any employees. <u>Id.</u> at 1113.

58.     In <u>C-TC</u>, finding that the debtor had not paid the property taxes and had taken no action in the case for more than a year after the filing. <u>Id.,</u> at 1312, the court dismissed the case as a bad faith filing.

59.     Courts applying the <u>C-TC</u> criteria engage in a detailed factual analysis. In <u>Century/ML Cable Venture</u>, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2002) the Court found that "some but not all" of the factors were present, and while some factors may weigh in favor of dismissal, "[M]ore fundamentally, as the Court does not engage in a mechanical counting exercise, the Court believes that the …filing does not warrant dismissal for cause, as an overview of the …situation suggests that chapter 11 relief is warranted." <u>Id.</u> at 35. In <u>In re Sletteland</u>, 260 B.R. 657, (Bankr. S.D.N.Y. 2001), when a shareholder group sought to dismiss as a bad faith filing an individual debtor's chapter 11 filed after losing a derivative action, <u>citing</u> <u>In re Cohoes Industrial Terminal, Inc.</u>, 931 F. 2d 222 (2d Cir. 1991), <u>citing</u> <u>Collier's,</u> the court said: "[I]n reality, there is a 'considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.'" <u>Id.</u> at 662.

60.     Similarly, this Court in <u>68 West 127th Street LLC,</u> 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) citing to <u>In re Shar</u>, 253 B.R. 621, 621 and the numerous cases cited therein,

concluded that the "[t]he existence of 'bad faith' depends not on any one specific factor but on a combination of factors determined after careful examination of the facts of the particular debtor's case…Indeed a mechanical approach…would automatically doom almost every single asset case <u>ab</u> <u>initio</u>."   Instead, this Court in <u>68 West 127th Street</u> wrote:   "[T]he critical test  of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from the bankruptcy." <u>See</u> <u>In re Sletteland</u>, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001) construing <u>C-TC 9th Avenue Partnership</u> and <u>In re Cohoes Indust. Terminal); In re Kingston Square</u>, 214 B.R 713, 725; <u>68 West 127th Street, Id.</u>,  285 B.R. at 846.

61.     While the Second Circuit has announced certain indicia of a bad faith filing, courts have repeatedly held that a mechanical application of those factors is incorrect and this Court has said that such a mechanical application would result in the finding of bad faith in almost all single asset real estate cases. <u>68 West 127th Street, supra.</u>, 285 B.R. at 844. Instead, Courts have cautioned that the better course is for the court to take a broad overview of the case with the aim of determining the debtor's intent at the time of filing. <u>Id.</u> at 844. And while it is in appropriate to use the bankruptcy forum to re-litigate a case, (see generally <u>In re Wally Findlay Galleries (New York), Inc.</u>, 36 B.R. 849) (Bankr. S.D.N.Y. 1984)), contrary to allegations by Landlord, the facts disclose that the Debtor is not forum shopping or attempting to re-litigate, but rather is seeking appeals to vindicate its rights within the State Court system, and needed to file this case to preserve these rights before a warrant issued.

62.     In the instant case, the Debtor has more than a single asset.  The Debtor has the Lease and it has claims against the Landlord for damages that rely on the Lease being validated.  The Landlord argues that since the Debtor does not have any assets, this Court should conclude that the Debtor is not really a business.  However, the Debtor submits that this is incorrect.  Judge Gropper in In re Sletteland, 260 B.R. 657 (Bankr. S.D.N.Y. 2001) determined that an individual consultant who filed a chapter 11 after losing a shareholder's derivative suit, filed in good faith.  The Court concluded that the debtor had a business, and the lack of employees was not necessarily determinative of whether there was a business.  Relying upon both In re Cohoes Terminal and C-TC, which held "…that good faith of the filing is to be determined on the basis of the petitioner's individual intent to reorganize and the lack of an intent to use bankruptcy solely as a mechanism to delay the creditor," the Skettleland Court concluded that if the case were dismissed, the debtor would be foreclosed from the opportunity of paying his creditors what they are due over time in an orderly fashion and affect a financial rehabilitation. Id., at 666.

63.     In the absence of the bankruptcy filing, the Landlord would have proceeded on its holdover action to have a warrant of eviction issued.  Upon eviction of the Debtor, the sole beneficiary would have been the Landlord.  In the absence of the institution of this bankruptcy case, the creditors would have lost the opportunity to be paid by the Debtor.

64.     Critically, the Sletteland Court determined that there was not a two-party dispute, because if the secured creditor were able to foreclose, the rights of other creditors would be impacted. Id. at 667.

65. Here, the Debtor submits that under the auspices of the Bankruptcy Code, it has preserved its rights in the Lease for all of its creditors. Should the Motion be granted, the other creditors would no doubt lose the opportunity to be paid the by Debtor.

66. As set forth herein, notwithstanding Landlord's attempts to color itself as the aggrieved creditor, the Debtor's financial distress establishes a legitimate reason to file for bankruptcy relief.

67. In 68 West 127 Street LLC, 285 B.R. 838, 840 (Bankr. S.D.N.Y. 2002), this Court applied the good faith factors to determine whether there was cause warranting a modification of the automatic stay and concluded: "[T]hat the debtor carried its burden that it is working within Chapter 11 constraints having reasonably established that it can effectively reorganize in a reasonable time and therefore is not misusing Chapter 11." It is submitted that the Debtor filed to preserve its rights in the Lease, and under the Bankruptcy Code is entitled to attempt to litigate its appeals, assume the Lease, and successfully consummate a plan of reorganization.

68. It is submitted that when the C-TC factors are examined, not in a mechanical balancing test that Landlord urges this Court to adopt; but rather, in view of the totality of the circumstances surrounding the Debtor's filing, and its intent at the time of filing, it is evident that the Debtor was in financial distress, required time to protect and prosecute the appeals, reorganize their financial affairs and sought bankruptcy protection for the valid purpose of doing so.

69. It is well-settled that the burden to establish cause for dismissal (or conversion) rests squarely on the party seeking such relief. In re Greene, 57 B.R. 272, 276

(Bankr. S.D.N.Y. 1986). In the case at bar, Landlord has failed to allege, let alone establish, specific "cause" for dismissal.

70.     Moreover, the weight of authority holds that where a case is in its early stages and a possibility of reorganization exists, dismissal is not warranted. In re Cardinal Congregate I, 113 B.R. 371 (Bankr. S.D. Ohio 1990); see, also, In re Foundry of Barrington Partnership, 129 B.R. 550 (Bankr. N.D. Ill. 1991). In In re Cardinal Congregate I, creditors moved to dismiss the case within two months after the filing of the voluntary petition. The bankruptcy court found that because the case was in existence for only a short time, it could not conclude that the Debtor had no reasonable probability of rehabilitation. In Re Cardinal Congregate I, 113 B.R. at 374. Significantly, the Cardinal Congregate I Court specifically noted that the exclusive period to file a plan had not expired, and that the debtor had manifested its intention to file a plan. Id. The Motion wholly fails to meet the heavy burden Landlord faces in establishing "cause" to dismiss the Debtor's case.

71.     Even if Landlord made any showing - which it has not - that portion of the Motion which seeks a modification of the automatic stay should be denied because it is well-settled that an unsecured creditor, like Landlord, is not entitled to a modification of the automatic stay, unless it can demonstrate that extraordinary circumstances exist which justify them being treated differently than the Debtor's other unsecured creditors. See, In re Liebowitz, 147 B.R. 341, 345 (Bankr. S.D.N.Y. 1992); In re Trista Automotive Group, Inc., 141 B.R. 41, 44 (Bankr. S.D.N.Y. 1992); (citing, Sonnax Industries, Inc. v. Tri Component Products Corp., 92 B.R. 591, 595 (Bankr. D. Vt. 1989), aff d, 907 F.2d 1280 (2d Cir. 1990)); In re I. Burack, Inc., 132 B.R. 814, 817 (Bankr. S.D.N.Y. 1991); In re Pioneer Commercial Funding Corp., 114 B.R. 45, 48 (Bankr. S.D.N.Y. 1990); In re Beauti-Full Size Boutique,

Inc., 110 B.R. 138 (Bankr. S.D.N.Y. 1990); In re Stranahan Gear Co., Inc., 67 B.R. 834

(Bankr. E.D. Pa. 1986).  Thus, unsecured creditors are rarely, if ever, granted relief from the

automatic stay because doing so would allow Landlord to get a leg up over other creditors,

violating the fundamental principals of bankruptcy law. In re Liebowitz, 147 B.R. at 341. As

stated by Judge Schwartzberg:

> The general rule is that claims that are not viewed
> as secured in the context of § 362(d)(1) should
> not be granted relief from the stay unless
> extraordinary circumstances are established to
> justify such relief. Generally, unsecured claims
> should not be granted relief from the stay because
> to do so would result in a violation of one of the
> fundamental concepts of bankruptcy law; that
> there should be an equality of distribution among
> creditors. An unsecured claimant should not be
> entitled to obtain a distributive advantage over
> other unsecured claimants who are similarly
> enjoined from seeking distribution by any method
> other than in accordance with the distributive
> scheme under the Bankruptcy Code.

Id. (citations omitted).  This is especially true where, as here, the request for modification of

the automatic stay is brought during the debtor's exclusivity period.  See e.g., In Re Pioneer

Commercial  Corp., Funding, 114 B.R. at 48.  Here, Landlord has failed to, and cannot, show

the "extraordinary circumstances" necessary to justify modification of the automatic stay, at

any time, much less now during the Debtor' exclusivity period.

72.    Further, with respect to the pending state court litigation, the Debtor filed its

appeals in the State Court and wishes to proceed.

**Conditioning Automatic Stay on Payment of Current Rent**

73.     It is Debtor's contention that due to the pending action relating to the Landlord's tortuous interference with the Urban sublease, that Debtor's ability to collect rent has been interfered with, and that pending the outcome of that case, Debtor should be allowed to defer its rent.

74.     Debtor submits that the damages sought therein are in excess of $25,000,000, and that based upon the Landlord unreasonably denying the Urban sublease, Landlord should not be entitled to receive rent from the Debtor.  Moreover, the carrying costs for the Premises are *de minimis*.  There is no mortgage on the Premises, and the only costs to the Landlord are insurance and security, if any.  Deferring rent until the outcome of the resolution of the Urban Action would appear not to prejudice either party.  Debtor will agree, however, to cover Landlord's actual out-of-pocket expenses for the Premises pending such a resolution.

75.     Accordingly, until Debtor's claims are resolved, the stay should be continued and should not be conditioned upon the Debtor's payment of the current rent.

**CONCLUSION**

76.     Debtor has not acted in bad faith in commencing this case.  Indeed, the Debtor's fiduciary duty to their creditors mandates that it had no alternative but to seek refuge in this Court.  This case is precisely the type of situation for which Chapter 11 was created, to preserve and protect a valuable asset and enable a debtor in possession to marshal its assets for the purpose of proposing a plan of reorganization and satisfying its creditors.

**WHEREFORE**, the Debtor seeks the entry of an order denying the Motion and granting them such other and further relief as seems just, proper and equitable.

**DATED:**      New York, New York
               September      , 2010


                              **ROBINSON BROG LEINWAND GREENE**
                              **GENOVESE & GLUCK P.C.**
                              Attorneys for Debtor
                              875 Third Avenue, 9th Floor
                              New York, New York 10022
                              Tel. No.: (212) 603-6300


                              By:  /S/A. Mitchell Greene_____
                                   **A. Mitchell Greene**